## IN THE MATTER OF A. HENRY GIORDANO, AN ATTORNEY AT LAW OF NEW JERSEY,

## IN THE MATTER OF JAMES F. HENNEBERRY, JR., AN ATTORNEY AT LAW OF NEW JERSEY.

Argued with respect to Respondent Giordano June 3, 1965.
Argued with respect to Respondent Henneberry January 10, 1967—
Decided April 24, 1967.

With respect to respondent, Giordano:

Mr. *Edmund J. Canzona* argued the cause for the Monmouth County Ethics Committee.

Mr. *George Warren* argued the cause for respondent Giordano (Mr. *Warren* and Mr. *Stephen F. Lichtenstein,* attorneys).

With respect to respondent, Henneberry:

Mr. *Max M. Barr* argued the cause for the Monmouth County Ethics Committee (*Mr. Norman Mesnikoff*, on the brief).

Mr. *John E. Toolan* argued the cause for respondent Henneberry (*Messrs. Toolan, Haney & Romond,* attorneys; *Mr. Toolan,* of counsel).

The opinion of the court was delivered

PER CURIAM. The Monmouth County Ethics Committee returned two presentments charging respondent A. Henry Giordano with unethical conduct. The proceeding against respondent James F. Henneberry, Jr. grew out of conduct coming to our attention in one of the Giordano proceedings. We directed the Committee to hold a hearing and report to us thereon, upon receipt of which we issued an order to show cause why Henneberry should not be disbarred or otherwise disciplined, as had previously been done with respect to the Giordano presentments. Disposition of the Giordano charges has been withheld pending completion of the Henneberry matter.

The Giordano presentment which does not concern Henneberry involved a charge of improper withholding of a real estate broker's commission received by Giordano as trust funds at a title closing. The sum was finally paid over after the complaint was filed with the Committee, which, while properly critical of his handling of the matter, did not find unethical conduct in that connection. Giordano had, however, used moneys in his trust account for purposes other than those for which they were to be held and the Committee reported him guilty of violating *Canon* 11. There can be no question of the correctness of that finding.

The other presentment and the Henneberry proceeding derived from Giordano's representation of a criminal defendant and Henneberry's participation in a loan transaction to raise the fee Giordano exacted. Walter DeGrote, Sr., an

elderly man of limited education and little business experience, who earned his living as a clammer in Monmouth County, had a son who was in difficulties there. He had pleaded *non vult* to a larceny charge and, on June 12, 1960, while on bail awaiting sentence, was arrested for carnal abuse of a 13-year-old girl. On June 24 he was sentenced to an indeterminate term in Bordentown Reformatory on the larceny charge and commenced serving the sentence. Neither respondent had any connection with the larceny case.

About this time the father retained Giordano to defend the son on the carnal abuse charge and paid him a $150 retainer. No fee was fixed or apparently even discussed at that time. A short time later, on July 13, DeGrote paid Giordano an additional $500 at the latter's request. He said no mention was even then made of the total fee, but Giordano testified he indicated it would be $3,500 and that DeGrote agreed. Be that as it may, some time thereafter Giordano asked for a further $3,000. DeGrote said it was on the representation that if it was paid, Giordano would get the son out of jail within six months. The latter denied any such representation and the Committee found that the evidence did not establish any had been made. DeGrote did not have the money and, while he apparently did not object to the figure, said it could only be obtained by a mortgage on one of two properties he owned in Port Monmouth. One property was his dwelling; the other was also a residence. Both were of relatively low value and subject to first mortgages. There is no question but that Giordano offered to obtain a second mortgage loan to satisfy the fee. DeGrote testified it was to be secured by only one property. Giordano said it was understood the mortgage was to cover both. In any event DeGrote realized that he could never pay the proposed loan except through a sale of one of the properties and he said Giordano assured him he would never be without a home.

On August 14 the son signed an agreement, presented to him at the reformatory, agreeing to pay Giordano $3,000 "in addition to retainer heretofore paid." The son testified noth-

ing was said then about the proposed mortgage and that Giordano told him he could pay the sum from his earnings as a clammer after his release from prison. The record is not clear whether the son's agreement was signed before or after Giordano and the father had their conversation about the loan, and it is equally uncertain whether during this period it was understood the son would go to trial on the charge or would enter a plea.

Around this time, whether before or after payment of the additional $3,000 was agreed to is not apparent in the evidence, but before any further fee payment was made or anything occurred with reference to the proposed mortgage, Giordano conferred with the Chief Clerk of the Monmouth County Prosecutor's Office, a lay employee, about a reduction of the carnal abuse charge. According to the testimony of the Chief Clerk, taken by the Committee on remand by this Court to explore this phase of the matter, the charge (as to which an indictment had not been returned) was reduced to attempted carnal abuse, although, as the Chief Clerk testified, the State's evidence of a completed offense was "strong" — "they were caught red-handed and he admitted it." On August 24 the son entered a plea of *non vult,* on waiver of indictment, to an accusation for the attempt.[1]

The second mortgage loan was consummated on September 28, after young DeGrote had entered the plea and the only thing remaining was the imposition of sentence. This brought about the involvement of Henneberry, who otherwise had no

---

[1] Our inquiry of the County Prosecutor disclosed that at this time the Chief Clerk was authorized to make decisions as he did here. The Prosecutor subsequently advised us that this practice had since been changed, as it clearly should have been, and any reductions in charge must now receive the personal authorization of the Prosecutor.

The reduction of the charge substituted a misdemeanor carrying a maximum sentence of three years, *N. J. S.* 2A:85–5 and 7, for an offense with a maximum punishment of 15 years, *N. J. S.* 2A:138–1. The only reason the Prosecutor has given us for the reduction was that DeGrote was already in the reformatory and was needed as the chief witness against a codefendant. He did testify at the latter's trial in 1961, which resulted in an acquittal.

connection with the DeGrotes or with Giordano in the criminal matter. Henneberry was then or formerly a relative of Giordano by marriage. Admittedly, Giordano solicited Henneberry to obtain a loan after he had been unsuccessful elsewhere and the latter procured a corporate client in the realty investment business, Lehmann-Gerth Estates, Inc., to make it. Giordano testified that he informed Henneberry that the DeGrotes "owed me a fee and so forth, and if he could get it, it would be as a personal favor to me and to the DeGrotes." (Henneberry had previously testified that he understood the DeGrotes wished a short term loan to consolidate some debts pending a sale of the properties; he was not thereafter questioned about Giordano's testimony in this regard.)

It is undisputed that Giordano took the elder DeGrote and his wife to Henneberry's office on September 28 where they met the latter for the first time. DeGrote's brother testified he was also present, but Giordano and Henneberry said he was not. At least no one else was there. The DeGrotes at that time signed documents for a second mortgage loan from Lehmann-Gerth Estates, Inc., in the amount of $3,000 covering both properties, payable in four months, with interest at 6%. They contended before the Committee that they were not advised the mortgage included both properties, but the Committee found the evidence did not establish that there had been a fraudulent inducement to execute a mortgage on two properties rather than one.

Although the testimony of DeGrote and his brother before the Committee (Mrs. DeGrote did not testify because of ill health) was not entirely clear and precise as to all the details of the loan closing, undoubtedly due to age, failing memory in the light of the fact that nearly four years had passed at the time of their testimony, and lack of complete understanding of what took place, they were positive that $1,000 of the $3,000 loan proceeds was handed back to Henneberry by Giordano at the closing. This phase of the matter and the testimony of Henneberry and Giordano concerning it present

very serious aspects of these disciplinary proceedings, to the details of which we will shortly return.

To complete the narrative, according to the Prosecutor's records testified to before the Committee, on October 7 young DeGrote was sentenced on the reduced charge of attempted carnal abuse to an indeterminate term at Bordentown consecutive to that he was then serving for the larceny offense. He served slightly over two years in all. DeGrote could not, of course, repay the $3,000 on the due date of January 28, 1961. Henneberry demanded payment two days later on behalf of the lender and instituted a foreclosure action shortly thereafter in which the entry of a default judgment followed in due course. DeGrote thereafter, after getting no help from Giordano, sought assistance from another attorney, who made a motion to reopen the default to assert usury and fraud in the inclusion of both properties in the mortgage. For some reason not clear to us, this motion was never determined on the merits and DeGrote was afforded no relief. The properties were purchased by the lender for a nominal sum, subject to the first mortgages, at the foreclosure sale, which was not held until some time in 1962. In 1963 it sold one property for $8700 (upon which the first mortgage was $5,938.88) and the other for $6500 (upon which the first mortgage was $3,094.86). DeGrote's pre-second mortgage equity, wiped out by the transaction, can therefore be assumed to have been around $6000.

DeGrote filed the instant complaint against Giordano with the Committee in April 1963. It in substance charged unethical conduct in that Giordano had obtained the agreement to pay the additional $3000 fee on the representation he would secure the son's release from jail in three months and that both properties had been included in the mortgage when only one was to be (we have already adverted to the Committee's disposition of these two charges, which we find it unnecessary to deal with further), plus the claim that $1000 of the $3000 loan had been returned to the lender as interest and that foreclosure had occurred causing loss of

his home and his other property. Giordano filed an answer amounting to a general denial, including also a specific averment that the entire $3000 was turned over to DeGrote at the closing and a specific denial that $1000 was paid for interest.

When the complaint came on for hearing in October 1963, DeGrote expressed a desire to withdraw it. The Committee acquiesced, but upon review of the Committee's report to that effect, we directed that withdrawal not be permitted and that a full hearing be held. The hearing took place in May 1964, at which most of the testimony previously referred to was given.

It should be noted that some time in 1963 DeGrote engaged still another attorney to pursue a damage claim against Giordano. A settlement figure of $4000 was arrived at, whether before or after the ethics complaint was filed we do not know. But it was at least before the Committee authorized withdrawal of the complaint in October 1963, since DeGrote testified at the May 1964 hearing that he received $1500 of the sum in August 1963 and the balance a week before his testimony.

To return to the details of the loan transaction as testified to at the 1964 hearing, DeGrote and his brother said in substance, as has been mentioned, that, after the mortgage papers were signed in Henneberry's office, Henneberry handed Giordano an envelope containing money and the latter handed back some of it to the former without explanation and that Giordano told them after they left the office he was only getting $2000 and had passed $1000 back to Henneberry for interest. DeGrote denied that he ever had possession of any of the money. Henneberry, who had his office file in the matter with him, but not his financial records, testified positively that he received the $3000 in cash from his client, did not deposit it in his trust account, handed the money to Giordano at the closing who counted it and turned the whole sum over to DeGrote. He further said that DeGrote and his wife then signed a receipt for it

(DeGrote acknowledged the signatures but indicated he had not appreciated what he was signing) and DeGrote took all the cash with him. Henneberry further testified that no closing statement was prepared and that he had not charged the DeGrotes for his services and disbursements on behalf of the mortgagee, although that was his customary practice. Rather, he said, he later billed his clients therefor, but could produce no bill or state the amount. He agreed that his client, though a complete stranger to the borrowers, would thereby lose money in agreeing to receive only $60 interest for a second mortgage loan while having to pay him more than that amount for his fee and expenses.

Giordano corroborated Henneberry's story and added that the DeGrotes returned to his office after the closing. There, he said, DeGrote gave him $2000, saying that was enough for a fee, to which he agreed, and kept the remaining $1000. He typed a receipt, which he signed, acknowledging receipt of the $2000 plus the $650 previously paid as the fee in the criminal case. The receipt also contained the statement: "It is understood and agreed that no one has made any promises to anyone with reference to the sentence to be imposed by the Court in this said matter." Giordano had Mr. and Mrs. DeGrote sign, with the brother as a witness, an approval "as a correct and true statement" at the foot of the receipt.

On this state of the evidence, the Committee in its presentment "found insufficient proof" that the full $3000 mortgage proceeds were not paid to DeGrote. It further found, however, that the admitted fee of $2650 "was exorbitant and unconscionable and a violation of Canon 12" and that on this ground Giordano was guilty of unethical conduct.

The orders to show cause issued by us on this and the other Giordano presentment previously referred to came on for argument together. We decided that a remand to the Committee was in order for further evidence and report, *inter alia,* as to the records of the mortgage lender "with disclosure of the identity of the parties in interest, the

source of the mortgage money and the disposition thereof, and an explanation as to why cash was used rather than checks." The further hearing before the Committee did not take place until October 1965, by which date Giordano had become seriously ill. He did not appear, on the advice of his physician, but was represented by counsel who participated in the examination of the witnesses, nor did he take advantage of the Committee's offer to appear at some later date.

Henneberry was recalled by the Committee and radically changed his former testimony. He gave as the reason that he had since located and checked his office financial records which corrected a faulty original memory. The upshot of his new testimony was that he received a $3000 check from one of the principals of his client the day before the closing which he deposited in his trust account and on the day of the closing drew a check thereon to himself in the same amount. He cashed the check and produced the currency at the closing. After he explained the mortgage papers and they were signed, he handed the cash to Giordano (not to DeGrote as he had previously testified), who counted it in the DeGrotes' presence. The DeGrotes then signed the receipt for $3000 and Giordano thereupon returned $1000 to Henneberry. This procedure was followed he said "because I seem to recall I wanted the DeGrotes to see and have the $3000." The next day he redeposited $700 in his trust account and drew and delivered a check to the lender in that amount, the stub for which recited "bonus." The remaining $300 he deposited in his office business account as his fee. Contrary to his previous testimony, he did not bill his client. It was made clear that his client had fixed the amount of the bonus and he the amount of his fee in advance (all of this was confirmed by the testimony of the two principals of the client corporation) and that Giordano had known of and had agreed to the deduction. Henneberry did not testify that the DeGrotes were advised of the ar-

rangement at the closing or were made to understand what went on.

The result was a four-month loan at an annual interest rate of 70%. The truth of the DeGrotes' story at the 1964 hearing was completely verified. And the inference is irresistible that the DeGrotes did not know of the bonus arrangement before the closing nor was it made known to them until after they had left Henneberry's office.

When the Committee reported this testimony to us, we ordered the Committee to hold a hearing and report to us concerning Henneberry's having given false testimony before the Committee and as to whether he was guilty of unethical conduct in participating in a usurious and unconscionable transaction.

At the same time we advised Giordano's attorney that a brief might be filed in his behalf with respect to his guilt on the same charges. The response to this advice was the submission of his resignation from the bar, with prejudice, pursuant to R. R. 1:18A, accompanied by information from his attorney that he had closed his office and by his physician's reports indicating that his illness had become permanent. The Committee thereafter recommended acceptance of the resignation, but we deferred action thereon pending the completion of the proceeding against Henneberry.

At the Committee hearing on the latter, Henneberry testified that he did not intend to testify falsely at the first Giordano hearing, but rather that he had relied on an inaccurate memory. Supporting stress was laid on the fact that his financial records, when checked, clearly spelled out the true nature of the transaction, which one would not expect to be the case if it were intended to be concealed and willfully lied about. While admitting full knowledge that the loan was patently usurious, he claimed lack of appreciation that a lawyer's participation therein or in an unconscionable transaction constituted unethical conduct. The Committee in its report found as a fact that, atlhough he was remiss in preparing to testify at the first hearing, he did not intend to will-

fully mislead the Committee, and that, while the loan was both a usurious and unconscionable transaction, he was innocent of knowing his participation therein was unethical.

While the finding of the Committee that Henneberry's false testimony at the first Giordano hearing was not willfully given might well be thought questionable in the light of the entire record and the full course of events, we will accept the Committee's assessment of his credibility since it saw and heard him in both sets of testimony. So we are constrained to acquiesce in the conclusion that he was not guilty of that charge.

 As to the participation in a usurious or unconscionable transaction, first let it be said that a lawyer cannot excuse unethical conduct of any kind simply by claiming that he did not personally know his conduct was proscribed. For the protection of the public and the integrity and reputation of the profession, the standard must be an objective and not a subjective one. When it is plain that certain conduct would reasonably be considered to be unethical by upright members of the bar, as well as where the subject matter is covered by a specific canon or decision of this court, all lawyers are bound to conform regardless of personal views or individual appreciation. The public obligation of the profession requires that its standards be of the highest quality. See *In re Mattera,* 34 *N. J.* 259, 263–264 (1961).

 Counsel for both Henneberry and the Committee agreed at oral argument that representation by a lawyer of either the lender or the borrower in any unquestionably usurious transaction, as this one most certainly was, is unethical. However, we are not certain that it was so considered, under the criterion just mentioned, when this transaction took place in 1960. We say this especially in view of the fact that the question, though raised, was not passed upon by this court in *In re Greenberg,* 21 *N. J.* 213 (1956). Recently the N. J. Advisory Committee on Professional Ethics has spoken positively on the matter, saying in its *Opinion* 71, 88 *N. J. L. J.* 170 (March 18, 1965) : "If, in fact, the loan is usurious and

the attorney knows or has reason to know it, he must refrain from participating in the transaction." We concur in that view and it now can be taken as settled that an attorney's participation in or representation of either a lender or borrower in a transaction usurious without doubt under the laws of this State amounts to participation in an illegal undertaking and therefore unethical conduct.[2] In view of this history, we do not think Henneberry should be disciplined on the basis of participation in a usurious transaction in 1960.

The matter of his participation in an unconscionable transaction stands differently, however. We have no doubt that he knew the loan was to pay Giordano's fee in the light of Giordano's testimony to that effect and of Henneberry's final testimony that he gave the money to Giordano and not to DeGrote at the closing. Clearly then he was bound to realize that the DeGrotes had no independent advice or representation in the transaction for certainly Giordano was acting in his own interest. Without question, the transaction was highly unconscionable and the grossest kind of overreaching of the DeGrotes, quite apart from the matter of the propriety of the amount of the fee. The situation is analogous to that in *Greenberg, supra* (21 *N. J.* 213) and under the circumstances Henneberry must be found guilty of unethical conduct by reason of his participation.

As to the discipline to be imposed, we appreciate that he was very probably subject to familial pressure to procure the loan, to which, however, he should not have acceded, and we accept his statement that this was the first such transaction in which he had ever been involved. Assessing the whole situation, we believe that a suspension for six months should

---

[2] Since, however, the penalty for the exaction of usurious interest is limited solely to the loss of all interest, *N. J. S. A.* 31:1-3, and then only if the borrower is an individual, *N. J. S. A.* 31:1-6, we also agree with the Advisory Committee that an attorney, who did not participate in the original usurious transaction, may represent either borrower or lender with respect to collection of the debt. *Opinion No. 83*, 88 *N. J. L. J.* 629 (September 30, 1965).

be imposed. In addition, he cannot be allowed to profit in any degree from his participation and we direct that he pay to the Committee within 30 days, for its transmission to DeGrote, the $300 he received as a fee. We may add that we consider that sum to be excessive in any event for the services he said he rendered, even having regard to any expenses incurred.

Turning to Giordano, we completely agree with the Committee that the fee of $2650 he received from DeGrote was "exorbitant and unconscionable." At the time the $2,000 loan proceeds were paid to him, the only remaining service to be rendered in the criminal case was appearance at sentence. As we appraise the evidence concerning work done prior thereto, the $650 previously paid was more than adequate compensation. We say this having due regard to the result obtained, since, rightly or wrongly, the criminal charge was obviously easily reduced.

Apart from this, it is extremely plain without further elaboration that Giordano's conduct toward his clients with respect to the loan transaction was utterly unconscionable. We say this without regard to the matter of his obviously false testimony before the Committee. Such conduct, coupled with the finding of misuse of trust moneys in the Committee's other presentment, warrants disbarment. As earlier indicated, he has tendered his resignation with prejudice, which, as *R. R.* 1:18A prescribes, is equivalent to disbarment. In the light of his counsel's representation that he is permanently disabled by reason of illness and closed his office more than a year ago, we will, in the exercise of our discretion, accept the resignation, effective this day. We would be inclined to condition the acceptance upon repayment of the $2000 he received (which represents the difference between the equity in the properties which the DeGrotes lost and the amount of the settlement he made with them), were it not for the fact that the settlement figure was arrived at when the DeGrotes were represented by reputable counsel and, it must be assumed, upon due consideration of all relevant factors.

We are consequently not disposed to go beyond the amount which they then agreed to.

It is so ordered.

With respect to Giordano:

*For acceptance of resignation with prejudice*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.

With respect to Henneberry:

*For suspension for six months*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.