**In the Matter of Paul R. REED, a Member of the Bar of the State of Delaware.**

Supreme Court of Delaware.

Submitted April 6, 1981.

Decided May 4, 1981.

Disciplinary Proceedings Upon Final Reports of the Censor Committee of the Supreme Court.

Jackson R. Dunlap, Jr., Georgetown (argued), for Censor Committee.

Henry duPont Ridgely, Dover (argued) of Ridgely & Ridgely, P.A., Dover, for Paul R. Reed.

Before HERRMANN, C. J., DUFFY and QUILLEN, JJ.

PER CURIAM:

Several matters concerning Paul R. Reed, a member of the Bar of the State of Delaware, are before the Court for decision.

I

The Censor Committee, an agency of this Court created under Supreme Court Rule 62, has held hearings involving separate charges of professional misconduct against Reed and has filed two Final Reports stating findings of fact, conclusions of law and recommendations of discipline. The Reports are as follows:

*As to Representation of Samuel D. Cohen (No. 259, 1978):*

"Findings of Fact:

The following facts shall constitute this Committee's findings of facts herein:

1. The Respondent, PAUL R. REED, was retained as legal counsel for SAMUEL

D. COHEN (hereinafter called COHEN) in the early part of 1975 to represent him in filing a voluntary petition in bankruptcy to the United States District Court, District of Delaware. COHEN at the time was in the business of operating two Western Auto stores in Sussex County, Delaware. Respondent represented COHEN in preparing and filing a Petition for Bankruptcy in February of 1975.

2. A meeting was held at Respondent's office in February, 1975, with COHEN and two representatives of Western Auto. An arrangement was agreed upon whereby Western Auto would pay the sum of $12,500 needed (1) to satisfy COHEN's creditors, (2) to pay COHEN's income taxes and (3) to pay COHEN's accountants for the preparation of tax returns. It was estimated at that time that his Federal Income Tax obligation was $8,000 for the calendar year 1974. It was further agreed that COHEN would withdraw his Bankruptcy Petition. No formal written agreement was made to cover this arrangement. However, Respondent filed a petition to dismiss the bankruptcy petition in March 1975 summarizing the foregoing arrangement for payment of COHEN's creditors including the payment of COHEN's income taxes to the date of the filing of the petition.

3. The Respondent received TWELVE THOUSAND FIVE HUNDRED FIFTY DOLLARS ($12,550) from Western Auto on or about April 3, 1975. During the period between April and August of 1975, the Respondent made the following disbursements totaling THREE THOUSAND NINE HUNDRED EIGHTY–FIVE DOLLARS and SEVENTY–EIGHT CENTS ($3,985.78): American Finance Company, ONE THOUSAND THREE HUNDRED DOLLARS ($1,300); First National Bank, SEVEN HUNDRED TEN DOLLARS and EIGHT CENTS ($710.08); Farmers Bank of the State of Delaware, FIVE HUNDRED DOLLARS ($500); The Bank of Delaware, TWO HUNDRED FIFTY DOLLARS ($250); Division of Revenue, TWO HUNDRED TWENTY–FIVE DOLLARS and SEVENTY CENTS ($225.70); and Moffit, LoRicco & Ballard, Accountants, ONE THOUSAND DOLLARS ($1,000).

4. The Respondent made no disbursement to the Internal Revenue Service.

5. A 1974 income tax return prepared by his accountants was signed and filed by COHEN in early 1976. The return reflected a tax due of NINE THOUSAND TWENTY–TWO DOLLARS ($9,022).

6. The Respondent made a written inquiry to the Director of Internal Revenue, Wilmington, Delaware on April 7, 1975 concerning a federal tax lien recorded in the Offices of the Recorder of Deeds, Sussex County, in the amount of THREE THOUSAND FIVE HUNDRED NINETY–SEVEN DOLLARS and ONE CENT ($3,597.01). The Respondent testified that a letter was received by him from the Internal Revenue stating that there was no record of a tax liability on the part of COHEN. However, the Respondent took no action to cause the tax lien to be removed from the record.

7. On the evening of November 8, 1976, the Respondent made a telephone call to COHEN and advised COHEN that he had received a letter from the Internal Revenue Service; that all creditors had been paid, and that there was approximately $3,800.00 left over for COHEN. The Respondent asked COHEN to meet him 'during banking hours' the following day.

8. Pursuant to the foregoing telephone call, COHEN met the Respondent in the Respondent's office on November 9, 1976. At the time of the conference there was $8,564.22 remaining in the Respondent's escrow account out of the $12,500.00 previously received by him from Western Auto. The Respondent drew a check payable to the order of COHEN in the amount of $5,709.48, had COHEN endorse the check and return it to him, cashed the check, gave COHEN $3,806.32 in cash and retained the difference of $1,903.16. In addition, and without COHEN's knowledge or consent, the Respondent issued a check to himself for the balance in the account of $2,854.74 for which the ledger entry read: 'atty/1/3'.

9. At the time Cohen was requested to and did endorse the foregoing check and

receive a portion of the proceeds, he asked the Respondent the reason why the Respondent was retaining the $1,903.16, to which the Respondent replied, 'I am taking all the risks.' The Respondent testified that by this he meant that if no taxes were due, the money should have gone back to Western Auto. Apparently, the Respondent was unaware that COHEN had earlier that year filed a federal income tax return for the year 1974 showing a tax obligation of $9,022.00.

10. At the times the Respondent received and made disbursements from the $12,500.00 account, including the final disbursements to COHEN and himself, he was fully aware that he held those funds as a fiduciary.

11. On or about November 14, 1977, CO-HEN received a notice of assessment from the Internal Revenue Service specifying that he was obligated to pay income taxes for the year 1974 in the principal amount of $9,022.00, in addition to which there were penalties and interest totaling $5,385.07, for a total of $14,407.07.

12. Upon receipt of the Internal Revenue Service notice, COHEN again contacted the Respondent to determine why the tax obligation had not been discharged. The Respondent then showed COHEN a disbursement sheet for his account which reflected no payment to the Internal Revenue Service and the final payment to the Respondent of $2,854.75. This was the first knowledge which COHEN had that the Respondent had charged him this sum and accordingly, requested his file. However, the Respondent advised COHEN that he could not locate the file.

13. The Respondent testified before the Committee at a hearing on May 24, 1978 that at the time of this meeting he did deliver the file to COHEN. COHEN testified to the contrary. The Committee finds COHEN's testimony in this respect to be correct.

Conclusions of Law:

14. The Respondent engaged in conduct involving fraud, deceit and misrepresentation contrary to DR 1–102(A)(4) of the Delaware Lawyer's Code of Professional Responsibility.

15. The Respondent neglected a legal matter entrusted to him contrary to DR 6–101(A)(2) of the Delaware Lawyer's Code of Professional Responsibility.

16. The Respondent intentionally failed to carry out his contract of employment with his client contrary to DR 7–101(A)(2) of the Delaware Lawyer's Code of Professional Responsibility." [1]

*As to Representation of William I. Handy, et al. (No. 3, 1980):*

"Findings of Fact

1. The Respondent, Paul R. Reed, was retained in March 1978 to represent William I. Handy, Mary Handy, Irvin E. Handy and Sandra H. Handy (Handys), who were borrowing $343,570.00 from the Farmers Home Administration (FHA). The Respondent informed FHA by letter dated March 29, 1978 that he was representing the Handys in the loan closing. The Respondent was then instructed by FHA to give a Preliminary Title Opinion on the real estate that was to be mortgaged to secure the loan.

2. The Respondent issued a Preliminary Title Opinion to FHA May 10, 1978. The Title Opinion noted among other things, the existence of a mortgage of Kerr-McGee Chemical Corporation. On May 22, 1978 FHA gave Respondent loan closing instruc-

---

[1]. The Code of Professional Responsibility provides as follows:
*DR 1–102(A)(4):*
"(A) A lawyer shall not:

. . . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."
*DR 6–101(A)(2):*
"(A) A lawyer shall not:

. . . . .

(2) Handle a legal matter without preparation adequate in the circumstances."
*DR 7–101(A)(2):*
"(A) A lawyer shall not intentionally:

. . . . .

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105."

tions and furnished him with the loan proceeds. Respondent was to hold the loan closing by June 1, 1978. One of the several loan closing conditions was that the amount of $37,129.00 was to be paid to Kerr-McGee Chemical Corporation on the mortgage of the Handys and that the mortgage be satisfied. The Respondent deposited the $343,-570.00 in the Paul R. Reed Settlement Escrow Accounts, Account Number 80 100 086 at The Sussex Trust Company, Georgetown, Delaware. He held settlement May 26, 1978, but made no payment to Kerr-McGee Chemical Corporation at that time. Respondent thereafter filed a Final Title Opinion to FHA July 24, 1978. That opinion did not reflect the lien of the Kerr-McGee mortgage which remained unsatisfied. Respondent filed another Final Title Opinion November 29, 1978. That title opinion did not reflect the lien of the Kerr-McGee mortgage which remained unsatisfied.

3. During the interval of time between the date of settlement and December 13, 1978, Kerr-McGee Chemical Corporation and the Handys were apparently attempting to resolve a disagreement as to the amount due on the obligation secured by the Kerr-McGee mortgage. However, Glenn Hitchens, an attorney for Kerr-McGee wrote to the Respondent on December 13, 1978, confirming that the sum of $37,695.30 was a firm settlement figure on the mortgage of the Handys to Kerr-McGee.

4. Thereafter, the Respondent communicated with Mr. Hitchens at least once by telephone in December and also by letter on January 2, 1979 requesting a meeting to pay-off the Kerr-McGee mortgage. By agreement, Respondent met with Mr. Hitchens January 9, 1979 and Respondent gave him two checks payable to Hitchens for Kerr-McGee drawn on the Paul R. Reed Real Estate Settlement Escrow Account for $22,695.30 and $15,000.00 respectively. The check for $22,695.30 was returned for 'insufficient funds'. Respondent thereafter drew a check from the same account payable to Hitchens for $7,695.30, on January 19, 1979 leaving a deficiency in the Handys account of $14,433.70.

5. The records of the Sussex Trust Company for the Paul R. Reed Settlement Escrow Account, Account Number 80 100 086 indicate that a balance in that account of at least $37,129.00 was not maintained throughout the period from June, 1978 through January, 1979.

6. The Respondent admitted that a deficiency in his Escrow Account existed during this period and that it occurred by reason of having two checks he had deposited therein in January, 1977 totaling $26,500.00 returned for 'insufficient funds'. One such check was drawn by one Madison Gray for $22,500.00 and the other from one James Quillen for $4,000.00. He further testified that the deficit arising from those two checks was reduced to approximately $15,-000.00 in 1977. The Respondent acknowledged in his testimony that his Escrow Account had a deficiency of at least $15,-000.00 as of May 31, 1978.

7. The records that the Respondent produced to the Committee are inadequate to explain the flow of the escrowed monies which he is supposed to be holding on behalf of other clients and the availability of funds to pay the amount owed to such clients.

8. The Trustees of the Client Security Trust Fund are presently conducting an audit of the Respondent's accounts.

9. The Supreme Court by a decision November 1, 1978 in the matter of Paul R. Reed, Action # 111, 1978, suspended Respondent from engaging in the private practice of law as a member of the Delaware Bar for a period of six months commencing December 1, 1978 and ending June 1, 1979.

10. Respondent was requested by letter of an investigating member of the Censor Committee dated March 8, 1979 to make available his records in respect to the real estate transaction dealing with the Handys and the FHA. No response was made [to] such a request prior to the hearing which was held May 24, 1979.

11. Interrogatories directed to the Respondent were served upon him on March 16, 1979, concerning the transaction between the Handys and FHA. No answers were filed until May 31, 1979, after the initial date set for the hearing on the Rule to Show Cause.

12. The Respondent has heretofore been disciplined by the Court and the Committee as follows:

(a) The Respondent by Opinion of the Court dated January 18, 1977 in Case No. 97, 1976, was disciplined by the Court.

(b) The Respondent was issued a private censure by the Censor Committee on December 3, 1973 in Case No. 297.

(c) The Respondent was issued a private censure by the Censor Committee on December 30, 1975, in Case No. 441.

(d) The Respondent was disciplined by the Court November 1, 1978 by being prohibited to engage in the practice of law as a member of the Delaware Bar for a period of six (6) months commencing December 1, 1978 and ending June 1, 1979.

Conclusion of Law:

Based upon the foregoing, the Committee concludes:

1. Respondent has violated DR 9–102 of the Code of Professional Responsibility in that he has failed to preserve the identity of funds of a client in an identifiable bank account maintained in this State.

2. Respondent has violated DR 1–102(A)(4) of the Code of Professional Responsibility in that he has misapplied funds belonging to clients in the amount of $15,000.00 from the escrow accounts.

3. Respondent has violated DR 1–103(C) of the Code of Professional Responsibility in that he failed to make available to an investigating member of the Committee records concerning a real estate transaction concerning a client which was pertinent to the subject of the investigation of the Respondent.

4. Respondent has violated DR 1–102(6) of the Code of Professional Responsibility by engaging in conduct that adversely reflects upon his fitness to practice law.

THEREFORE, the Committee recommends that Respondent be disciplined by this Court." [2]

■ Reed denies that he violated any Disciplinary Rule. As to the Cohen matter, he says that he did not retain the disputed sum ($1,903.16) and that the testimony of a Farmers Bank Officer supports him; and as to the Handy matter, he says that a deficiency occurred in his escrow account because checks received by him in other transactions were (properly) deposited in that account but were returned for insufficient funds after he had made disbursements on the basis of the checks, thus causing an overall shortage in the account. He has filed exceptions making these and other responses to each of the Reports by the Censor Committee. But we are not persuaded that there is merit to any of his exceptions. To the extent credibility was an issue, the Committee resolved it, and there is substantial evidence to support his findings of fact, and its conclusions of law (based upon such findings) are correct. Ac-

2. The Code of Professional Responsibility provides as follows:

*DR 9–102, in part:*

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except . . . ."

*DR 1–103(C):*

"(C) A lawyer under investigation by the Censor Committee of the Supreme Court of Delaware shall, upon proper request of the Censor Committee or an investigating mem-

ber or subcommittee of the Censor Committee, make available to the Censor Committee, its investigating members and subcommittees and their agents all books, records and other documents which may be pertinent to the subject of the investigation and which may not properly be withheld on the ground of privilege."

*DR 1–102(A)(6):*

"(A) A lawyer shall not:

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

cordingly, we confirm each Report as filed by the Committee. See Supreme Court Rule 64.

## II

Reed has been the subject of criminal proceedings which are summarized in a Supplemental Report filed by the Censor Committee in these proceedings, pursuant to a directive of the Court. The Committee's Report is as follows:

"The Committee, in accordance with the Court's Order of March 12, 1981, makes a report as to any criminal proceedings now pending against the Respondent, Paul R. Reed, in Delaware.

1. The Respondent was indicted by the Grand Jury of Sussex County on November 24, 1980, on two counts of theft in violation of Title 11, *Delaware Code*, § 841. A copy of the indictment is attached as 'Exhibit A'.

2. The Respondent on March 9, 1981, entered a plea of 'nolle contendere' to theft, a misdemeanor, a lesser included offense, to Count II in the Superior Court of the State of Delaware, in and for Sussex County. A pre-sentence investigation was ordered.

3. A Plea Agreement was entered into between the Deputy Attorney General and the Respondent on March 9, 1981, and filed with the Prothonotary, a copy of which is attached hereto as 'Exhibit B'. [The plea entered at the arraignment on March 9, 1981, differs from what is stated in the Plea Agreement in that he entered a plea of 'nolle contendere' to 80–11–0086.] However, Count I of the indictment will be nolle prossed at sentencing."

The indictment reads as follows:

"The Grand Jury charges PAUL R. REED with the following offenses:

### COUNT I. A FELONY

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

PAUL R. REED between the 22nd day of May, 1978, and the 9th day of January, 1979, while acting in the capacity as escrow attorney did legally receive control over $15,000 loaned by the United States of America to Irving Handy and did fraudulently convert to his own use over $300.00 in U.S. currency.

### COUNT II. A FELONY

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended,

PAUL R. REED on or about the 9th day of January, 1979, while acting in the capacity as attorney for Irving Handy did legally receive control over $568.30 belonging to Irving Handy and did fraudulently convert to his own use over $300.00 in U.S. currency."

The plea agreement Reed made with the State provides as follows:

"Defendant will plead nollo to: Theft (Misdemeanor)—a lesser included offense of 80–11–0085[.]

State will enter a Nolle Prosequi on: Theft (Felony)—80–11–0086[.]

State will recommend: a suspended period of incarceration based on Mr. Reed's making full restitution and to the ill health of Mr. Reed.

Other agreement: Before sentencing, Mr. Reed will tender his resignation to the Supreme Court of the State of Delaware and having made restitution $18,600.34 will make final payment of $923.40."

Reed has filed a Response to the Supplemental Report, stating as follows:

"Respondent, Paul R. Reed, responds to the March 13, 1981 Supplemental Report of the Censor Committee as follows:

1. Admitted.

2. Admitted that on March 9, 1981 the Respondent entered a plea of nolo contendere to misdemeanor theft. The plea was entered in Cr. A. No. 80–11–0086 which was Count II of the indictment rather than Count I as stated in the Plea Agreement. It is Respondent's understanding that the theory of the prosecution was that once an escrow shortage existed the drawing of any check to Respondent for

fees earned on subsequent real estate settlements was 'theft'. The drawing of such earned attorneys fees is not disputed. Admitted that a pre-sentence investigation was ordered.

3. Admitted.

## FURTHER RESPONSE

By way of further response, Respondent states he has complied with the additional terms of the Plea Agreement by having already resigned from the Bar of this Court effective February 6, 1981 and by having made full restitution to Mr. Irvin E. Handy on March 9, 1981 (See annexed letter of David W. Baker, Esq. dated March 12, 1981). Respondent reiterates that the previous inability to collect upon bad checks of prior clients and his further inability to promptly 'cover' the loss caused his present difficulties and that at no time did he intentionally convert escrow funds to his own use.

WHEREFORE, Respondent respectfully prays that further proceedings before this Court be discontinued as moot."

It is undisputed that Reed has made full restitution to the Handys.

## III

As appears from the plea agreement, Reed has submitted his resignation as a member of the Bar of this Court. Indeed, prior to the date on which he entered into the plea agreement with the State, Reed submitted his unqualified resignation to this Court.[3] We have not acted on that resignation.

## IV

As the records of this Court show, Reed is not a stranger to the Censor Committee nor to our disciplinary processes. On December 3, 1973, a private censure was administered to him by the Censor Committee, and a similar censure was issued by the Committee on December 30, 1975. On January 18, 1977, this Court, after hearing, issued a public censure to him and fined him $5,000. *In the Matter of Paul R. Reed*, Del.Supr., 369 A.2d 686 (1977). On November 1, 1978, again after hearing, the Court prohibited him from engaging in the private practice of law for a period of six months beginning December 1, 1978. *In Re Reed*, Del.Supr., 394 A.2d 221 (1978). Reed's suspension in the latter proceeding began on December 1, 1978, and, since that date, he has been effectively removed from the practice of law in Delaware.

Meanwhile, Reed has had serious health problems. A medical report filed with the Court shows that, on May 8, 1980, because of severe obstruction of the "epicardial coronary arteries," he underwent "aorta coronary bypass graft surgery." Apparently it was successful and he is asymptomatic as to his "atherosclerotic cardiovascular disease in regards to his angina pectoris," but he has hypertension which is controlled by medical therapy and he also has "significant ventricular arrhythmias." The effect of emotional strain and stress remain a medical concern in relation to his degree of stability.

There is before us, then, both Reed's resignation from the Delaware Bar (submitted both prior to and as part of the criminal proceedings) and the now confirmed Reports of the Censor Committee. The question is what judgment the Court should make under the circumstances.

The matters involving Mr. Cohen and the Handys are serious breaches of Reed's responsibility to properly represent his clients, to keep adequate financial records and to properly account for and administer trust funds in his custody. But, considered in isolation, each of those matters would not require disbarment of a lawyer who was otherwise blameless; that, however, is not Reed's case. He has been censored by the Censor Committee on at least two prior

3. Reed's letter of resignation states:
"As the members of the Court are aware, I am presently suffering from certain disabling coronary problems and hypertension.

Having been a member of the Delaware Bar since 1956, it is with regret that I now unconditionally resign from the Delaware Bar for medical reasons effective this date."

occasions and had been disciplined by this Court twice in the eighteen months immediately preceding the date on which he last practiced law. The Court can and must view the present question in the context of Reed's recent conduct in determining what order is appropriate. *In re Reed*, 394 A.2d at 225.

The specific question, then, is whether the Court should accept Reed's resignation or reject it and order discipline independent of it.

A number of Courts have considered comparable problems and there does not appear to be any significant trend or agreement as to whether an attorney charged with misconduct should be permitted to resign or whether the Court should order disbarment. See Note, *"Legal Profession—Resignation From the Bar Under Charges,"* 26 Mo.L. Rev. 90, 91 (1961). Accepting or rejecting a proffered resignation rests in the judicial discretion of the Court.[4] *Annot.:* "Resignation of Attorney as Member of Bar," 54 A.L.R.2d 1280 (1957).

If Reed's purpose in submitting his resignation is to have the Court accept it as a voluntary surrender of his office as a member of the Bar and end all disciplinary proceedings without further comment or consequence, we reject that proposition. Clearly, the resignation is before the Court under the compulsion of both the criminal and disciplinary proceedings with a significant prior history of the same sort of conduct. In that context, we decline to accept Reed's resignation as a pure act of choice on his part.

On the other hand, culpable as Reed's conduct and history appear to be, there are mitigating circumstances which the Court should consider. His health is obviously one of these. And we note with some emphasis that he has made full restitution to the Handys of the loss they sustained as a result of his conduct. While restitution does

not forgive the conduct, it is a quality which justice requires and which is to be encouraged in a defalcations case. Cf. *In Re Green*, Del.Supr., 331 A.2d 145, 147 (1975). And while we consider the context in which Reed's resignation is submitted, we conclude that disbarment should not be ordered primarily for punishment purposes. *In re Bennethum*, Del.Supr., 161 A.2d 229, 236 (1960).

The realities are that no matter what the nature of our order, Reed will no longer engage in the practice of law in this State and the public censure flowing from publication of this opinion will provide a significant measure of punishment and deterrence.

We conclude that just as we will not regard nor accept Reed's resignation as a purely voluntary act, neither will we order his disbarment independent of the resignation. We only determine that Reed's prior record and the present misconduct, tempered by the mitigating factors (his health, his resignation, and full restitution), should result in an Order striking his name from the roll of attorneys of this Court.

Viewing the record as a whole, an Order will be entered embodying the following terms:

(1) The name of Paul R. Reed shall be stricken from the rolls of attorneys of this Court and his authority to practice law in the State of Delaware and in the Courts thereof shall be revoked.

(2) A certified copy of such Order and of this Opinion shall be transmitted by the Clerk to the Register in Chancery and to the Prothonotary in each County of the State, to the Clerk of the Family Court of the State of Delaware, to the Clerk of the Court of Common Pleas in each County of the State, to the Clerk of the Municipal Court of Wilmington, and to the Chief Magistrate of the Justice of the Peace Courts.

---

4. Compare Joint Committee on Professional Discipline, National Center for Professional Responsibility and the American Bar Association, *Professional Discipline for Lawyers and Judges*, commentary to Rule 11.2, at p. 138 (1979). See *Application of Harper*, Fla.Supr.,

84 So.2d 700, 54 A.L.R.2d 1272 (1956); *In re Fruchter*, 68 N.J. 286, 344 A.2d 320 (1975); *In re Giordano*, Supr., 49 N.J. 210, 229 A.2d 524 (1967); *In re Evers*, Wash.Supr., 41 Wash.2d 942, 247 P.2d 890 (1952).

(3) A certified copy of such Order and of this Opinion shall be transmitted by the Clerk to the Clerk of the United States Court of Appeals for the Third Circuit and to the Clerk of the United States District Court for the District of Delaware.

(4) A certified copy of such Order and of this Opinion shall be transmitted by the Clerk to any governmental agency requesting a record of Reed's current or prior standing as a member of the Bar of this Court and to any other agency authorized to make inquiry or maintain records pertaining to the discipline of lawyers.